[No. 46015-3-I.  Division One.  December 18, 2000.]

*In the Matter of the Custody of* CHANCE T. NUNN.
JULIA NUNN, *Respondent,* v. LAUREN ARNESON, *Appellant.*

---

872

*Catherine Wright Smith* and *Brendan P. Finucane* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*), for appellant.

*Gary F. Bass* (of *Levinski Bass & Johnsen*), for respondent.

KENNEDY, J. — Lauren Arneson appeals an order granting custody of her son to his paternal aunt, Julia Nunn. The nonparental child custody petition should have been dismissed when Julia Nunn failed to present substantial evidence to prove her allegation that Arneson is an unfit parent because of alcohol abuse and prostitution. Under chapter 26.10 RCW, Washington's nonparental child custody statute, a nonparent lacks standing to seek custody of a child, as against a fit parent who has physical custody of the child. The allegation of parental unfitness required by RCW 26.10.030 thus presents a threshold issue that should be addressed as early in each nonparental child custody proceeding as may be practicable in all the circumstances of the given case. Here, the failure of the parties and the trial

court to focus on the question of Julia Nunn's standing to bring this custody proceeding resulted in months of irrelevant inquiry by the guardian ad litem into the relative merits of the mother and aunt as prospective custodians, a five-day trial, an erroneous custody order, and this appeal— not to mention unwarranted disruption of the parent-child relationship of Arneson and her son, and the resulting heartache to each of them. We reverse and remand for dismissal of Julia Nunn's petition and the prompt return of Chance Nunn to his mother's full care, custody and control, without restrictions.[1] We also grant Arneson's request to be awarded her reasonable attorney fees for this appeal.

## FACTS

Lauren Arneson was married to Robert Nunn and they had one child, Chance Nunn, who was born on March 30, 1987. When Chance was two years old, Arneson and Robert Nunn divorced. A parenting plan was entered granting both parents legal custody, granting residential time disproportionately to the father, and giving the father discretion to require that the mother's residential time with the child be supervised, due to the mother's drinking problem. After being arrested for drunken driving in 1994, Arneson entered a two-year treatment and deferred prosecution program. She successfully completed the program and, by the time of trial, had remained sober for five years. Following her return to sobriety, Arneson and her son, who was 12 years old at the time of trial, enjoyed liberal unsupervised overnight residential time together two to three days per week, until the death of Robert Nunn and the commencement of this custody proceeding.

---

[1] This ruling makes it unnecessary that we address Arneson's contention that Washington's nonparental child custody statute unconstitutionally infringes on the fundamental right of parents to make decisions concerning the care, custody and control of their children in violation of the state and federal constitutions because it allows a court to deprive a parent of custody in favor of a nonparent under the "best interests of the child" standard without requiring the court to accord the parent (1) a presumption of fitness, and (2) deference to the parent's decisions regarding the child's best interests. *See State v. Breazeale*, 99 Wn. App. 400, 994 P.2d 254 (citing *Tropiano v. City of Tacoma*, 105 Wn.2d 873, 877, 718 P.2d 801 (1986)), *review granted*, 11 P.3d 826 (2000).

Julia Nunn is the father's sister. From 1988 to 1991, Nunn occasionally cared for Chance while the father was working as a commercial pilot. Julia Nunn moved to California in 1991, and returned to Washington in 1996. She moved into the father's house in November 1998, one month before he died of leukemia. Shortly before his death, Robert Nunn changed his will, establishing a testamentary trust for the benefit of Chance, and naming Julia Nunn as the guardian of Chance's person and estate. By the terms of the trust, Julia Nunn will receive $200,000 if she successfully keeps custody of Chance until he turns 18 years of age. In the meantime, the trust pays Julia Nunn's living expenses and her legal fees for the current custody proceeding, and pays nothing to Arneson for Chance's support.

On December 8, 1998, two days before Robert Nunn died, Julia Nunn filed a nonparental custody petition seeking physical and legal custody of Chance. In the petition, Nunn alleged that Arneson was an unfit parent because she is a severe alcoholic who continually abuses alcohol and works as a prostitute. A court commissioner entered an ex parte order temporarily granting Nunn full custody, restraining Arneson from interfering with Nunn's custody, and setting up a return date for the show cause order that was issued contemporaneously with the temporary custody and restraining order.

On December 23, 1998, at the show cause hearing, another court commissioner awarded Nunn temporary custody for 30 days pending a report from guardian ad litem (GAL) Don Layton. Arneson's visitations with Chance were limited to Sundays and Wednesday evenings.

Layton submitted his report, not in 30 days, but six months later, in June 1999. In his report, Layton explicitly compared the relative parenting abilities of Arneson and Nunn, utilizing the statutory criteria contained in RCW 26.09.187(3) for determining residential placement as between two divorcing parents. Although concluding that Nunn was the more stable of the two caretakers, Layton

noted that Arneson and her son had a "bonded mother-child relationship," and that Chance consistently expressed his desire to live with his mother. Layton also reported that Arneson's psychotherapist, Dr. Vath, stated that she had worked hard to address both her alcohol and anxiety problems, and was competent to care for Chance. Layton also reported that Dr. Saltonstall, Chance's psychotherapist, had noted the strong bond between mother and son and suggested that at that point in Chance's development, this bonding likely outweighed Arneson's probable deficits as a parent.

Layton recommended that Arneson be granted temporary custody pending entry of a permanent parenting plan. Layton further recommended that Chance have residential time with his Aunt Julia on the first and third weekends of each month, one weekday evening each month, and two weeks in the summer. He also recommended, inter alia, that the court require close monitoring and case management of the parenting plan by the GAL, that Chance continue in therapy with Dr. Saltonstall, that Arneson engage in therapy with one of three psychologists of the GAL's choosing, and that all professionals dealing with the family communicate regularly with one another under signed releases, for at least a period of one year following entry of a parenting plan. Finally, Layton recommended that if the parties could not agree to his recommendations above outlined, that the court award permanent custody of Chance to Julia Nunn.

Following this report by the GAL, the court returned Chance to his mother's temporary custody in July 1999, where he remained until the trial in November 1999.

Layton also testified at the trial, which ran for five days. He was critical of Arneson's failure to keep Chance in the same school pending trial, and of the fact that Arneson was openly hostile toward Julia Nunn, toward longtime friends of Robert Nunn who had filed declarations in favor of Julia Nunn's custody petition, toward Dr. Saltonstall, Chance's therapist, and toward others whom she viewed as having

taken Julia Nunn's side in the ongoing custody litigation. He indicated that Chance would likely lose contact with Julia Nunn and the Nunn family if Arneson were given permanent custody of Chance. Although Layton confirmed that Arneson had remained sober since completing her treatment for alcoholism, he believed that she had lied to him when she denied ever having worked for an escort service—in part because he had examined her home telephone records and found some 20 calls to the telephone number for an escort service during a period of time from 1994 to 1996, and in part because Arneson reportedly told the police officer who arrested her for driving while intoxicated in 1994 that she was working as a call girl at that time. Layton found no evidence that Arneson was still so employed; to the contrary, she was unemployed, engaged to be married and was being supported by her fiancé. Layton recommended that Julia Nunn be awarded permanent custody of Chance.

The court also heard testimony from Dr. Rebecca Saltonstall, a psychotherapist who was chosen and paid by Nunn, initially to help Chance deal with his father's death and, later, to help him deal with issues related to this custody action. Nunn relies primarily on the testimony of Dr. Saltonstall to support her claim that Arneson was properly found to be an unfit parent. Nunn specifically focuses on 13 "things Lauren Arneson was doing which were damaging Chance Nunn[.]" Each allegation is quoted from the Respondent's Brief at 30-32, and is followed by a summary of the relevant evidence in the record, and an indication of whether the trial court made any reference to the evidence in making its findings of fact:

(1) "Failing to keep Chance Nunn in his old school after promising to do so[.]" Dr. Saltonstall testified that Arneson promised to keep Chance in a particular school, and then she did not do so. The trial court made no finding based on this evidence.

(2) "Alienating Chance Nunn from his father's family and support group[.]" On two occasions, Arneson berated Julia

Nunn, Layton, Dr. Saltonstall, and associates of Chance's father, in front of Chance. Dr. Saltonstall testified that Arneson's behavior undermined Chance's feelings of safety with these people. Dr. Saltonstall also testified that continuing contact with Robert Nunn's family and friends was important to Chance's well-being. The trial court relied on this evidence in making findings of fact IX and XIII.

(3) "Creating problems at Chance Nunn's old school[.]" Dr. Saltonstall testified that people at Chance's school reported that Arneson had been unreliable in following up on specific plans, such as times to pick Chance up, that school officials had some difficulties interacting with Arneson, and they expressed concerns about her emotional condition. The trial court made no finding based on this evidence.

(4) "Failing to bring Chance Nunn to counseling sessions with Dr. Saltonstall[.]" Dr. Saltonstall testified that Arneson failed to bring Chance to therapy on an unspecified number of occasions. The trial court relied on this evidence in making finding of fact IX.

(5) "Alienating Chance Nunn from his therapist Dr. Saltonstall[.]" Arneson once insulted Dr. Saltonstall in front of Chance and others and left in an angry manner. The trial court relied on this evidence in making finding of fact IX.

(6) "Lauren Arneson was unable to put Chance Nunn's needs ahead of Lauren Arneson's[.]" Dr. Saltonstall testified that, in her experience, she had "not seen [Arneson] demonstrate a capacity to put her own personal needs aside and focus her maternal concern on her son's needs." Report of Proceedings (RP) at 269. The trial court made no finding with respect to this evidence, but could have relied upon it, at least in part, in making finding IX.

(7) "Lauren Arneson was unable to cope in a stable way all of the time[.]" Dr. Saltonstall testified that "she was quite anxious at times . . . so it was clear to me that she wasn't able all the time to be coping in a stable way." RP at 274. The trial court made no finding with respect to this evidence.

(8) "Lauren Arneson was unable to give social support to Chance Nunn[.]" Dr. Saltonstall testified regarding surviving caregivers generally, and stated, "[S]tudies show that depressed and anxious parents just by virtue of the fact that they are depressed and anxious aren't really able to provide adequate nurturance and support for the child[.]" *Id.* The trial court made no finding with respect to this evidence.

(9) "Lauren Arneson was inflicting emotional maltreatment and emotional neglect on Chance Nunn[.]" Dr. Saltonstall testified that she observed emotional maltreatment and emotional neglect by Arneson, and that such behavior is what she was "referring to when [she said] she hasn't been able to put aside her own personal issues and in a sense imagine herself walking in Chance's shoes and being able to see how he might be experiencing listening to her talk, for example, negatively about other people who could be social supports for him." *Id.* at 276. The trial court relied on this evidence in making findings of fact IX and XIII.

(10) "Lauren Arneson had a paranoid attitude[.]" Dr. Saltonstall testified that she thought Arneson had a paranoid attitude. The trial court made no finding with respect to this evidence.

(11) "Lauren Arneson failed to consistently treat her anxiety disorder[.]" Nunn fails to state where this can be confirmed in the record. The trial court made no finding with respect to this allegation.

(12) "Lauren Arneson failed to attend Alcoholics Anonymous meetings[.]" Arneson suffered from alcoholism for several years. In 1995, she entered and ultimately successfully completed a two-year treatment program, and her claim of complete sobriety since that time was unrefuted. Arneson's chemical dependency counselor testified that Arneson is in a sustained full-remission and has no need to attend AA meetings. Dr. Vath agreed. Julia Nunn admitted

at trial that when she filed her petition alleging that Arneson was an unfit parent based on abuse of alcohol, she was unaware that Arneson had successfully completed treatment and had remained sober for five years. The trial court made no finding with respect to this evidence.

(13) "Lauren Arneson was lying about being employed by an escort service or being a prostitute." Layton disbelieved Arneson's denials that she had ever been employed by an escort service or worked as a prostitute, in part because of his examination of old telephone records that showed Arneson had made some 20 calls from her home telephone to a number listed for an escort service, during 1994 to 1996, and in part because Arneson reportedly told the police officer who arrested her for driving while intoxicated in 1994 that she was working as a call girl at that time. The trial court made no finding with respect to this evidence.

On appeal, Arneson assigns error to the following findings of the court:

2.4: . . . Lauren Arneson is not a suitable custodian for the following reasons: she is not a fit parent.

## IX.

Dr. Rebecca Saltonstall indicated that primary custody by Lauren Arneson of Chance Nunn was harming him because Lauren Arneson is not allowing Chance Nunn to have a good relationship with the Nunn family and support group; Lauren Arneson did not cooperate with Chance Nunn's therapy by Dr. Saltonstall; Lauren Arneson's actions have prevented Chance Nunn from completing the grieving process over the death of his father; and the harm will continue as long as Lauren Arneson is the primary custodian of Chance Nunn.

## X.

Don Layton, the Guardian ad Litem, recommended primary custody to Julia Nunn as forth [sic] in his Guardian ad Litem Report dated September 23, 1999 . . . which indicated Lauren

Arneson's primary temporary custody of Chance Nunn is harmful to him and will continue to be harmful to him as long as Lauren Arneson has primary custody of Chance Nunn.

## XI.

Don Layton and Dr. Saltonstall are both competent and independent experts in parenting and child custody issues.

. . . .

## XIV.

Julia Nunn has shown she has the parenting skills to meet the needs of Chance Nunn.

## XV.

Lauren Arneson is not self-supporting.

## [Second] XV.

The court's conclusions concerning the best interests of the child are based on the following facts: See paragraph 2.4 above.

The court also entered additional findings that are relevant to this appeal:

## VII.

Don Layton, the Guardian ad Litem for Chance Nunn, recommended that Lauren Arneson be granted temporary custody of Chance Nunn in June, 1999. . . . Lauren Arneson was granted temporary custody of Chance T. Nunn on June 7, 1999 and he has continued in her care to present.

. . . .

## XII.

Chance Nunn has a bonded mother-child relationship with Lauren Arneson.

XIII.

Chance Nunn has a relationship with a group of neighbors and friends which is beneficial to Chance Nunn and should be fostered.

## DISCUSSION

▆▆▆ This nonparent custody action is governed by chapter 26.10 RCW. Under RCW 26.10.030, a nonparent may commence an action seeking custody of a child "but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." Thus, a nonparent lacks standing to seek custody of a child as against a fit parent having physical custody. This is because "[g]reat deference is accorded to parental rights, based upon constitutionally protected rights to privacy and the goal of protecting the family entity." *In re Marriage of Allen*, 28 Wn. App. 637, 646, 626 P.2d 16 (1981) (citing *In re Welfare of Becker*, 87 Wn.2d 470, 477, 553 P.2d 1339 (1976); *In re Welfare of Luscier*, 84 Wn.2d 135, 524 P.2d 906 (1974)). *See also In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

A parent's constitutionally protected right to rear his or her children without State interference is a fundamental liberty interest protected by the Fourteenth Amendment and a fundamental right derived from the privacy rights inherent in the constitution. Where a fundamental right is involved, State interference is justified only if the State has a compelling interest and such interference is narrowly drawn to meet only the compelling State interest involved. *Custody of Smith*, 137 Wn.2d at 15. "Both parens patriae power and police power provide the state with the authority to act to protect children lacking the guidance and protection of fit parents of their own . . . ." *Id.* at 16 (citation omitted). But the State can intrude upon a family's integrity under parens patriae power only when parental actions or decisions seriously conflict with the physical or mental

health of the child, and can intrude under police power in the interest of society as a whole only when parental actions or decisions directly and severely imperil the child. *Id.* at 16-18.

Thus, a threshold inquiry for any nonparental child custody action under chapter 26.10 RCW is whether the nonparent petitioner has standing to bring the action, that is, whether the nonparent petitioner can produce substantial evidence to support the allegation of parental unfitness by which he or she gained entry to the courthouse in order to file the petition. Without substantial evidence of parental unfitness, a nonparent petitioner lacks standing to bring the action, and it should be dismissed. As should be apparent from the history of this action, the threshold inquiry regarding standing should be made as early as may be practicable under the circumstances of each case, so as to minimize unwarranted State interference with the integrity of the family unit where the allegation of parental unfitness cannot be supported by substantial evidence.

Here, the court commissioner who heard the show cause hearing gave Julia Nunn temporary custody of Chance for 30 days pending a report from the GAL. Thirty days should have been ample time in which to determine whether Arneson was abusing alcohol and working as a prostitute, as alleged in Julia Nunn's petition. Instead, the GAL launched a full-scale, six-month-long investigation into the relative merits of Julia Nunn and Lauren Arneson as custodians, utilizing the criteria set forth in RCW 26.09.187(3) for establishing residential provisions in parenting plans as between divorcing parents, in accord with the best interests of the child.

These are not the criteria for determining custody in a nonparental child custody proceeding. *See Marriage of Allen*, 28 Wn. App. at 645-47 (best interests of the child standard of former RCW 26.09.190 essentially compares the merits of the prospective custodians, awards custody to the better of the two, and is properly applied as between parents; as between a parent and a nonparent, trial court

erred in awarding custody to nonparent when father not found to be unfit in the usual sense). *See also In re Custody of Anderson*, 77 Wn. App. 261, 264, 890 P.2d 525 (1995) (In custody disputes between parents, a court determines the child's best interest by deciding which parent offers the child the better home environment. However, in a custody dispute between parents and nonparents, the analysis must accommodate the natural parents' "constitutionally protected priority right to the custody of their children . . . ."). *Accord Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Custody of Stell*, 56 Wn. App. 356, 365, 783 P.2d 615 (1989).

Between a parent and a nonparent, therefore, a more stringent balancing test is required to justify awarding custody to the nonparent. *Marriage of Allen*, 28 Wn. App. at 645-46. This is due to the long recognized principle in Washington that "[the parent] has the natural and legal right to the custody and control of the children, unless so completely unfit for such duties that the welfare of the children themselves imperatively demand[s] another disposition of their custody." *In re Neff*, 20 Wash. 652, 655, 56 P. 383 (1899).

Unfortunately, insofar as we can determine from the record, nobody informed the GAL that the work he was performing was entirely irrelevant unless and until it could be shown that Arneson was an unfit parent, and that his first order of business should have been to investigate Julia Nunn's allegations of unfitness contained in her petition. The GAL's log shows that he did, eventually, investigate those allegations, although he clearly was in no rush to do so. The GAL was appointed on December 23, 1998. He interviewed the officer who had arrested Arneson back in 1994, on March 10, 1999, and on that same day also interviewed a private detective who had been hired to investigate Arneson's activities. On March 23, 1999, the GAL interviewed the director of the alcohol recovery program that Arneson successfully completed. On March 30, 1999, the GAL interviewed Arneson's psychotherapist, and

on May 7, 1999, the GAL interviewed Arneson's Treatment Alternative Street Crime (TASC) evaluator. From these interviews, the GAL was able to confirm Arneson's continuing sobriety and that she was not employed as a prostitute—although there was an indication that she may have worked as a call girl some years earlier.

The GAL filed his report on June 23, 1999, and the court returned Chance to his mother's temporary care early the following month. Arneson, who was represented by different counsel below from her counsel on appeal, could have, and we venture to say should have, moved for summary judgment challenging Julia Nunn's standing when it became apparent from the GAL's report that Julia Nunn's allegations of parental unfitness not only could not be substantiated, but also that Arneson was fit to be awarded Chance's temporary care—indeed, his permanent care, in the opinion of the GAL, if Arneson had been willing to submit to the kind of State intrusion into the integrity of her family unit that the GAL was recommending.

But, insofar as we can ascertain from the record on appeal, no motion for summary judgment was filed, and Julia Nunn's standing remained unchallenged.

According to the GAL's notes, by May 25, 1999, the focus of the case had shifted from Arneson's sobriety and moral values to her mental health issues, and from there to the question of Chance's opportunity to maintain bonds with his paternal family and friends if he were in his mother's custody—given her hostility toward Julia Nunn and all facets of the continuing custody litigation. And indeed, it was these latter issues that the trial court ultimately relied upon in declaring Arneson to be an unfit parent.

Although this case should have ended by way of summary judgment no later than in July 1999 when Chance was returned to his mother's home, the case did not end there, and Julia Nunn's standing was never challenged, even as of the time of trial. And so we must treat the petition as having been amended to conform to the proof at trial, and consider the sufficiency of the evidence to support the trial

court's finding of unfitness as actually made, rather than as alleged in the petition. *See Marriage of Allen*, 28 Wn. App. at 642-43 (trial court, by its finding on unsuitability, inferentially deemed the pleadings amended by the proof at trial pursuant to CR 15(b) even though unfitness never pleaded).

■ The parties disagree about the standard of proof for unfitness in a nonparent custody action. The court in *Marriage of Allen* explained that in such cases, "[t]here must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the 'best interests of the child' test. Precisely what might outweigh parental rights must be determined on a case-by-case basis." *Id.* at 649; *Custody of Anderson*, 77 Wn. App. at 264.

We need not decide the standard of proof beyond that stated in *Allen*, because here, whether the standard is clear, cogent, convincing, or compelling, or by a preponderance of the evidence, the proof of unfitness was insufficient to support the court's order. Certainly we find substantial evidence in the record to support the trial court's determination that Chance Nunn would benefit from having a good relationship with his father's side of the family, particularly his Aunt Julia, and that Arneson was not at all fond of Julia Nunn after the custody action was commenced. Similarly, there is substantial evidence in the record that Chance would benefit by continuing to have a relationship with friends of his deceased father—and that Arneson was not particularly supportive of those friendships because these same friends aligned themselves with Julia Nunn in the custody proceedings by filing declarations on her behalf. Similarly, the record supports a conclusion that Chance needed grief counseling and counseling with respect to the trauma of the ongoing custody litigation. And the record is replete with evidence that Arneson became very hostile toward Dr. Saltonstall—after Julia Nunn and the GAL began to use Dr. Saltonstall to evaluate the custody issues, effectively muddying the waters between Dr. Saltonstall as the child's therapist and Dr. Saltonstall as a custody evalu-

ator. Finally, there is substantial evidence in the record that Arneson's actions prevented Chance from completing the grief process following the death of his father—in this sense and only in this sense: Arneson decided to fight the custody petition through to its bitter end, and the custody litigation itself prevented Chance from completing the grief process. All the experts agreed on this point.

The record is crystal clear: Two days before the death of Robert Nunn, Julia Nunn filed the custody petition, obtained an ex parte order wresting custody of Chance from his mother, obtained the support of the father's friends in the endeavor, obtained the support of the child's grief counselor in the endeavor—and Lauren Arneson had an extremely hostile reaction to the whole process and to all who appeared to have a part in it—from Julia Nunn, to the family friends, to Dr. Saltonstall, as well as to the GAL. First, Arneson had to defend herself against unfounded allegations that she was drinking again and that she was working as a prostitute. She eventually prevailed, as to those issues. Then she had to defend herself against allegations that she was too emotionally unstable to be a fit parent. She eventually prevailed, as to that issue as well. Then, she was faced with allegations that she was unfit as a parent because she didn't respond with warmth toward the people who raised the earlier, false allegations, and failed to cooperate with the efforts of these people to maintain a relationship with her 12-year-old son. Neither did she respond graciously to the persons who were evaluating the custody issues, the GAL and Dr. Saltonstall.

■ And so the question boils down to this: Can an otherwise fit parent be found unfit because she chooses to fight a nonparental custody petition, because she openly expresses her dislike of the side of the family that brought the custody petition, because she avoids old family friends who are supporting the other side in the custody litigation, because she doesn't trust the custody evaluators who have been brought into the litigation, and because she doesn't foster a good relationship between her child and all of those people? The answer is no.

■ There can be no other conclusion from the evidence in this record but that Lauren Arneson lost custody of her child because she tried to defend the integrity of her family unit against State intervention that was unfounded in the first place because it was based on a petition containing allegations of parental unfitness that ultimately proved to be false. In many ways, this case presents a mirror image of the circumstances in *Custody of Smith*, 137 Wn.2d 1. There, nonparents sought visitation rights against the wishes of a fit parent, and our Supreme Court said that parents have a right to limit visitation of their children with third persons, and that it is not the province of the State to make significant decisions concerning the custody of children merely because it could make a "better" decision. *Id.* at 20-21. Here, a nonparent sought custody of a child, ultimately on the basis that it would be so much "better" for the child to have a relationship with the nonparent and her friends and support group, against the wishes of a parent, as to render the objecting parent unfit, simply for objecting to the relationship. It would be an anomaly to consider an otherwise fit parent unfit simply for exercising her funda- mental right as a parent to limit visitation of her children with third persons—even if, as in *Smith*, those third per- sons are loving family members and close friends of family.

There is no evidence whatsoever that Arneson would have objected to Chance continuing his relationship with Julia Nunn and with his father's friends, and with Dr. Saltonstall, but for the custody litigation and the threat that litigation posed to the integrity of Arneson's family unit.

Accordingly, we reverse the custody order and remand this case for dismissal of Julia Nunn's petition and for the prompt return of Chance Nunn to his mother's care, cus- tody and control, without restrictions.

Attorney Fees

■ RCW 26.10.080 provides for a discretionary award of attorney fees and costs, at the superior court and on appeal, upon a showing of financial need. *See Custody of Smith*, 137 Wn.2d at 21-22; *Anderson*, 77 Wn. App. at 267. The record reflects that Julia Nunn's legal expenses for this action have been paid by the testamentary trust established by Robert Nunn, and that the trust has also paid her living expenses while she has had custody of Chance. Lauren Arneson has filed a financial affidavit establishing need, as required by RAP 18.1. We award Arneson her reasonable legal fees and costs for this appeal, in a sum to be determined by a commissioner of this court upon Arneson's timely compliance with RAP 18.1(d).

AGID, C.J., and COX, J., concur.

Reconsideration denied January 26, 2001