[No. 25690-8-II. Division Two. September 28, 2001.]

## In the Matter of the Custody of R.R.B.

BRUCE ROSENTHAL, *Respondent*, v. SALLY BUDACK, ET AL., *Appellants*.

604

*Daniel J. Shea*; *Rainer A. Frank* and *Jeffrey A. Robinson* (of *Law Offices of Jeffrey A. Robinson*); and *Theresa L. Fricke*, for appellants.

*Felix Landau*, for respondent.

*Shaleen D. Brewer*, as guardian ad litem.

ARMSTRONG, C.J. — Chuck and Sally Budack, the adoptive parents of R.R.B. (RRB), appeal an order awarding custody of RRB to Bruce Rosenthal, RRB's biological father. The trial court found that although the Budacks were fit parents, their continued custody of RRB would detrimentally affect her growth and development. The Budacks contend that awarding custody to Rosenthal, who had relinquished his parental rights at the time of the adoption, violates the policy in favor of finality in adoptions. They also argue that the statute allowing a nonparent to petition for custody is unconstitutional. Finally, the Budacks assign error to the trial court's orders for visitation, child support, and attorney fees. We hold that the adoption statutes do not prevent Rosenthal from petitioning for custody under the nonparental custody statute and that the nonparental custody statute is constitutional. But we hold that the court erred in delegating authority to RRB's counselor to set visitation. Accordingly, we remand to the trial court to set a visitation schedule; otherwise, we affirm.

## FACTS

In 1990, Chuck and Sally Budack adopted RRB, Sally's biological niece. Bruce Rosenthal, RRB's biological father, had consented to the Budacks' adoption of RRB when she was six.[1] But Rosenthal, with the Budacks' permission, kept in contact with RRB.

RRB began to have mental health problems in 1997, when she was 13 years old. At the time, she lived with the Budacks. RRB told various medical providers that the Budacks had physically and emotionally abused her. She described beatings with a leather belt, a wooden paddle, and a wire hanger. She also said the Budacks forced her to do sit-ups and push-ups as "military" disciplinary tools. Report of Proceedings (RP) at 182. RRB told the providers that she wanted to live with Rosenthal rather than the Budacks. With the Budacks' permission, RRB moved in with Rosenthal and his wife, Becky.[2]

While living with the Rosenthals, RRB attempted suicide and was hospitalized in September and December 1998. She again reported the Budacks' abuse and also reported some conflict in the Rosenthal home. Doctors found that RRB had self-inflicted cuts and scrapes.

In December 1998, Child Protective Services (CPS) investigated RRB's allegations, but the results were inconclusive. CPS released RRB to the Budacks, who immediately sent her to live with her grandmother in Texas. Within several weeks, RRB was again hospitalized for self-mutilation and mental health problems.

In January 1999, Rosenthal petitioned for custody of RRB under the nonparental custody statute, chapter 26.10 RCW. After he was awarded temporary custody of RRB on January 26, 1999, he brought her back to Washington and she entered Fairfax Hospital. The doctors diagnosed bipolar

---

[1] A North Carolina state agency had given Sally Budack custody of RRB and her brother in 1984 because of concerns that Rosenthal and his then-wife were neglecting the children. Sally Budack is Bruce Rosenthal's sister.

[2] Becky was not married to Rosenthal when he lost custody of RRB in 1984.

disorder and post-traumatic stress disorder (PTSD). After two weeks, the doctors released RRB on medication; they also recommended counseling. At the time of the custody hearing, RRB was receiving counseling at the Everett Clinic and showed some improvement.

After a hearing in November 1999, the trial judge granted Rosenthal's petition for custody and appointed Bruce and Becky Rosenthal as cocustodians. He found that the Budacks were fit parents but concluded that placing RRB in their custody would detrimentally affect her growth and development. He based this conclusion on a number of factors: RRB's mental illness and its stabilization after living with the Rosenthals; RRB's involvement in the Rosenthals' church and community, and the resulting emotional stability; and RRB's own statements that she would react badly, and possibly hurt herself, if she were forced to return to the Budacks. The judge also ordered the Budacks to pay current and back child support; he ordered visitation as determined by RRB and her counselor; and he ordered each party to pay its own attorney fees.

## ANALYSIS

### I. Rosenthal's Standing

The Budacks argue that Rosenthal lacks standing because he relinquished his parental rights to RRB and consented to her adoption. The Budacks point to the public policy in favor of finality in adoption proceedings. Rosenthal responds that nothing in the nonparental custody statute, chapter 26.10 RCW, prevents him from petitioning for custody of RRB. Thus, Rosenthal's standing implicates two issues: the requirements of the nonparental custody statute and the legal effects of Rosenthal's voluntary termination of parental rights and consent to adoption.

■ Nothing in the nonparental custody statute prohibits Rosenthal from petitioning for custody of RRB. Under RCW 26.10.030(1), any person other than a parent may seek

custody of a child, "but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." The statute does not prohibit biological parents, whose parental rights were terminated, from petitioning for custody.

In *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the court held that under the plain language of RCW 26.10.160(3), which allows any person to petition for visitation at any time, a nonparent has standing to petition for visitation outside of a custody proceeding. *Smith*, 137 Wn.2d at 12-13. Here, as in *Smith*, the statute allows "any person" to petition for custody. We conclude that Rosenthal has standing under RCW 26.10.030(1) to petition for custody of RRB.

But the Budacks contend that Rosenthal cannot seek custody because he relinquished his parental rights. At the time of the adoption, Rosenthal relinquished "all legal rights and obligations with respect to the children." He also acknowledged that the court would sign an order "permanently terminating all of my parental rights to the children." Clerk's Papers (CP) at 215-18.

RCW 26.33.130(2) states that an order terminating a parent-child relationship "divests the parent and the child of all legal rights, powers, privileges, immunities, duties, and obligations with respect to each other except past-due child support obligations owed by the parent." The purpose of adoption, according to our legislature, is "to provide stable homes for children." RCW 26.33.010.

Washington courts have repeatedly emphasized the importance of finality in adoption. In *In re Adoption of Baby Girl K*, 26 Wn. App. 897, 615 P.2d 1310 (1980), the court refused to allow a birth mother to revoke her written surrender of her child to an adoption agency, citing the "strong public interest in the finality of these [adoption] procedures." *Baby Girl K*, 26 Wn. App. at 905.

Other cases have emphasized the sanctity of the adoptive

family. In *Mitchell v. Doe*, 41 Wn. App. 846, 706 P.2d 1100 (1985), the court denied a biological grandmother visitation with a grandchild who had been adopted by strangers. *Mitchell*, 41 Wn. App. at 850. Despite the broad language of the nonparental visitation statute permitting "any person" to petition for visitation, the court found it "abundantly clear" that the legislature did not intend for the non-parental visitation statute to permit a child's biological family to disturb the sanctity of the adoptive family. *Mitchell*, 41 Wn. App. at 850. And in *Bond v. Yount*, 47 Wn. App. 181, 734 P.2d 39 (1987), the court denied the paternal grandparents visitation with a child adopted by the maternal grandparents and "agree[d] with the *Mitchell* court that the Legislature did not intend [the nonparental visitation statute] to chip away the strong policy holding the privacy of adoption to be sacrosanct." *Bond*, 47 Wn. App. at 183. Accordingly, even though the adoption was by family members and not strangers, the petitioners lacked standing. *See also In re Custody of B.S.Z.-S.*, 74 Wn. App. 727, 875 P.2d 693 (1994) (grandmother lacked standing to petition for visitation when child was adopted by grandfather).

Nonetheless, we conclude that the adoption laws do not bar Rosenthal's petition. First, the adoption statute prohibits the relinquishing parent from contesting the *adoption* or otherwise participating in *the proceedings*. RCW 26-.33.130(4). Thus, Rosenthal forfeited his right to contest or otherwise participate in the 1990 adoption of his children. But nothing in the adoption statutes precludes him from participating in a separate, unrelated proceeding. And the cases involving dependency and involuntary termination of parental rights are distinguishable. For example, in *In re Dependency of G.C.B.*, 73 Wn. App. 708, 870 P.2d 1037 (1994), the court terminated the biological mother's parental rights in a dependency proceeding under chapter 13.34 RCW. *G.C.B.*, 73 Wn. App. at 710. The court held that her later petition to adopt the child should have been dismissed because "a parent whose rights have been terminated may not relitigate that issue through a petition for adoption, or

through any other legal proceeding." *G.C.B.*, 73 Wn. App. at 717.

But the dependency statute at issue in *G.C.B.*, RCW 13.34.200(1), states that a dependency proceeding order terminates all parental rights and obligations and *"the parent shall have no standing to appear at any further legal proceedings concerning the child."* (Emphasis added.) In contrast, when terminating parental rights under the adoption statute, RCW 26.33.130(4), the parent "is not thereafter entitled to notice of proceedings for the adoption of the child by another, nor has the parent . . . any right to *contest the adoption or otherwise to participate in the proceedings."* (Emphasis added.) Thus, an order under the dependency statute precludes a parent from participating in *any* future proceeding involving the child, while an order under the adoption statute prevents the parent only from further participation in *that adoption proceeding.*

Moreover, recognizing Rosenthal's standing does not invade the sanctity of the adoption procedure. This was an open adoption of a niece by her aunt and uncle. And Rosenthal has maintained contact with RRB since 1993. By the time Rosenthal brought the petition, RRB had already been living apart from the Budacks for 10 months. In fact, it was RRB who initially suggested that she would like to live with Rosenthal, and she continues to express a preference for living with him. We conclude that Rosenthal's nonparent petition for custody does not threaten the integrity of the adoption process.

## II. Constitutional Challenge to RCW 26.10.100

### A. Background

The Budacks contend that even if Rosenthal has standing, the nonparental custody statute violates their due process liberty and privacy interests. The statute allows "a person other than a parent" to petition for custody, as long as "the child is not in the physical custody of one of its

parents or if the petitioner alleges that neither parent is a suitable custodian." RCW 26.10.030(1). RCW 26.10.100 requires a court to "determine custody in accordance with the best interests of the child."

 The substantive due process guarantee of the Fourteenth Amendment prohibits the government from infringing on fundamental liberty interests " 'unless the infringement is narrowly tailored to serve a compelling state interest.' " *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (quoting *Reno v. Flores*, 507 U.S. 929, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)). The right to the care and custody of one's children is a fundamental liberty interest. *Wisconsin v. Yoder*, 406 U.S. 205, 235-36, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). The Budacks argue that the nonparental custody statute is unconstitutional on its face because it fails to identify a compelling state interest, there is no statutory presumption in favor of a fit parent's decisions, and the statute is not narrowly tailored to meet the state's interests.

## B. RCW 26.10.100

Until 1987, chapter 26.09 RCW governed both parental and nonparental custody actions. The statute required the court to determine custody "in accordance with the best interests of the child." Former RCW 26.09.190 (1985). The statute listed several factors for the court to consider in making its determination of the child's best interests. In 1987, the legislature adopted chapter 26.10 RCW, Nonparental Actions for Child Custody, which includes RCW 26.10.100. The legislature's stated intent was "to reenact and continue the law relating to third-party actions involving custody of minor children in order to distinguish that body of law from the 1987 parenting act amendments to chapter 26.09 RCW, which previously contained these provisions." RCW 26.10.010.

## C. *Smith* and *Troxel*

The Budacks rely on *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). In *Smith*, the paternal grandparents petitioned for visitation rights under the nonparental visitation statutes, RCW 26.10.160(3) and former 26.09.240 (1989). The children's mother had allowed some visitation with the grandparents but not as much as the grandparents wanted.

After finding that the grandparents had standing, the Washington Supreme Court held the nonparental visitation statutes to be unconstitutional. First, the court concluded that the statutes served no compelling state interest that would justify state interference in a parent's child-rearing decisions. *Smith*, 137 Wn.2d at 19. The court noted that Washington courts have allowed state interference with child-rearing decisions "only when 'parental actions or decisions seriously conflict with the physical or mental health of the child.' " *Smith*, 137 Wn.2d at 18 (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)). And the court reasoned that the nonparental visitation statutes were flawed because they did not require a finding that third-party visitation was necessary to prevent some harm to the child. *Smith*, 137 Wn.2d at 19.

The court concluded that the "best interest of the child" standard is "insufficient to serve as a compelling state interest overruling a parent's fundamental rights. State intervention to better a child's quality of life through third party visitation is not justified where the child's circumstances are otherwise satisfactory." *Smith*, 137 Wn.2d at 20.

The United States Supreme Court affirmed on more narrow grounds. Four justices concluded that RCW 26-.10.160(3) was unconstitutional as applied.[3] Of particular

---

[3] The justices in the plurality were O'Connor, Rehnquist, Ginsburg, and Breyer. Justices Souter and Thomas concurred separately: Justice Souter found that the "best interests of the child" standard was unconstitutional because it swept too broadly, and Justice Thomas concluded that there was no compelling state

concern to the United States Supreme Court was the lack of any allegation or finding that the mother was unfit. Further, the trial court had failed to presume that Granville, the mother, was a fit parent and had acted in her children's best interests. *Troxel*, 530 U.S. at 68. In fact, the Court noted, the trial court appeared to presume the opposite—that visitation by the grandparents was in the children's best interests and it was Granville's burden to disprove the presumption. *Troxel*, 530 U.S. at 69. And the Court reasoned that this contravened the "traditional presumption that a fit parent will act in the best interest of his or her child." *Troxel*, 530 U.S. at 69. Finally, the Court found error in that the trial court gave no weight to the mother's agreement to allow some visitation with the grandparents before they filed the petition. *Troxel*, 530 U.S. at 71. These problems, according to the Supreme Court, showed that "this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests." *Troxel*, 530 U.S. at 72. Because it held that the statute was unconstitutional as applied by the trial court, the plurality did not address whether due process requires all nonparental visitation statutes to include a showing of harm to the child before granting visitation to a nonparent. *Troxel*, 530 U.S. at 73.

## D. Cases Construing the Nonparental Custody Statute

■■ Washington courts have long recognized parents' fundamental rights to the care and custody of their children. *See, e.g., In re Neff*, 20 Wash. 652, 655, 56 P. 383 (1899) ("The fact that the children might be better educated, and better clothed, and have a more pleasant home with someone else than the parent can have no weight with the court as against the natural rights of the parent."). Accordingly, courts have applied the presumption of parental fitness in

interest as required by due process. Justices Stevens, Scalia, and Kennedy dissented.

custody cases where a nonparent seeks custody from a parent. This body of law, which the legislature incorporated when it reenacted the nonparental custody statutes, saves RCW 26.10.100 from constitutional challenge.

In *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981), a stepmother, Jeannie, sought custody of her stepson, Joshua, when she and Joshua's father divorced.[4] The trial court awarded Jeannie custody. Joshua's father, Joe, argued that the trial court had improperly applied the "best interests of the child" test. The court further recognized that although there was no constitutional challenge to the statute, the Court of Appeals recognized that a "best interests of the child" standard was insufficient when a nonparent seeks custody from a parent. Although the "best interests" test is proper when determining custody between parents, "between a parent and a nonparent, application of a more stringent balancing test is required to justify awarding custody to the nonparent. Great deference is accorded to parental rights, based upon *constitutionally protected rights to privacy and the goal of protecting the family entity.*" *Allen*, 28 Wn. App. at 645-46 (emphasis added).

The *Allen* court found that the state may interfere with the parents' constitutional rights only where (1) the parent is unfit, or (2) "the child's growth and development would be detrimentally affected by placement with an otherwise fit parent." *Allen*, 28 Wn. App. at 646-47. The latter, according to the *Allen* court, requires a showing of "actual detriment to the child, something greater than the comparative and balancing analyses of the 'best interests of the child' test." *Allen*, 28 Wn. App. at 649. Applying this test, the court determined that the trial court properly awarded custody to Jeannie, the nonparent. Although Joe was a fit parent, the trial court had determined that placing Joshua with his father would detrimentally affect Joshua's future develop-

---

[4] She sought custody under RCW 26.09.180, the statutory predecessor to RCW 26.10.030(1).

ment.[5] *Allen*, 28 Wn. App. at 649.

Later nonparental custody cases have consistently followed *Allen*'s two-part test. In *In re Custody of Stell*, 56 Wn. App. 356, 783 P.2d 615 (1989), the court refused to apply a "best interests of the child" standard to an aunt's petition for custody of her nephew. The court held that the legislature, in enacting chapter 26.10 RCW, intended to "reenact" *Allen*'s judicial interpretation of the previous nonparental custody statute. *Stell*, 56 Wn. App. at 365 (quoting RCW 26.10.010). According to *Stell*, to gain custody under chapter 26.10 RCW, the nonparent must establish either that the parent is unfit or that placement with an otherwise fit parent will detrimentally affect the child's growth and development. *Stell*, 56 Wn. App. at 365.[6]

This standard recognizes the presumption that a fit parent will act in the best interests of his or her child. Here, Rosenthal proceeded on the theory that although the Budacks were fit parents, RRB's growth and development would be detrimentally affected if she stayed with them. And this requires more than a simple balancing of the benefits of the two households. Rather, Rosenthal had to show that RRB's development would be detrimentally affected to the extent that it would " 'conflict with the physical or mental health of the child.' " *Smith*, 137 Wn.2d at 18 (quoting *Sumey*, 94 Wn.2d at 762).

We hold that RCW 26.10.100, as construed, is constitu-

---

[5] Joshua was deaf. While Joe and Jeannie were married, Jeannie had gone to great effort to help Joshua, learning sign language and teaching it to Joshua and her other children, and procuring special training for Joshua. He had made considerable progress in school largely as a result of her efforts. In contrast, Joe was only minimally fluent in sign language and did not appear as committed as Jeannie to Joshua's intellectual and academic development. *Allen*, 28 Wn. App. at 640-42.

[6] *See also In re Custody of Nunn*, 103 Wn. App. 871, 14 P.3d 175 (2000); *In re Custody of Brown*, 77 Wn. App. 350, 890 P.2d 1080 (1995); *In re Custody of Anderson*, 77 Wn. App. 261, 890 P.2d 525 (1995) (loss of wonderful opportunities for the child in the nonparent's home is not sufficient to show actual detriment to child by remaining in parent's home); *In re Custody of Dombrowski*, 41 Wn. App. 753, 757, 705 P.2d 1218 (1985); *Chapman v. Perera*, 41 Wn. App. 444, 704 P.2d 1224 (1985). No nonparental custody case has used the pure "best interests" test that the Budacks argue is unconstitutional.

tional. The state has a compelling interest in the statute's purpose—protecting children's welfare. The statute also recognizes the presumption of parental fitness, and the remedy is narrowly tailored to further the state's interest. We reject the Budacks' claim that the nonparental custody statute is facially unconstitutional.

### E. Unconstitutional as Applied

The Budacks claim that even if the nonparental custody statute is constitutional on its face, it is unconstitutional as applied. They appear to concede that the trial court, in awarding Rosenthal custody of RRB, identified a compelling state interest—preventing RRB from committing suicide or mutilating herself. But, they argue, the trial court "failed to create a remedy that had any respect for the Budacks' fundamental rights to parent RRB. The court also failed to narrowly tailor its decree to address RRB's mental health crisis." Br. of Appellant at 53-54.

First, the Budacks argue that the record does not support the trial court's conclusion that RRB would be safer with the Rosenthals than with the Budacks.[7] They cite their own attempts to get mental health treatment for RRB, and RRB's mental health problems during her first few months with the Rosenthals. But the Budacks ignore other evidence that RRB improved while living with the Rosenthals and RRB's own testimony that she wanted to stay with the Rosenthals and that she might harm herself if she were returned to the Budacks. This evidence supports the trial court's conclusion that placing RRB with the Budacks would detrimentally affect her.

■ The Budacks object to the grant of permanent custody to the Rosenthals, the nonparental custody statute's lack of a "frequent automatic review" provision, the custodial powers granted to Rosenthal by statute, the award of

---

[7] This allegation misstates the trial court's conclusion. The court concluded, in keeping with the *Allen* framework, that RRB's "growth and development would be detrimentally affected" by placement with the Budacks. CP at 517.

child support, and the visitation schedule. The essence of their claim is that in each of these decisions, the trial court failed to acknowledge their fundamental right to the care and custody of RRB, and it failed to presume that their decisions regarding RRB are correct. According to this argument, even *after* ruling that RRB would be detrimentally affected by returning to live with the Budacks, the trial court must defer to the parents in all areas of decision making. For this proposition, the Budacks rely on *Troxel*, 530 U.S. 57.

But *Troxel* is distinguishable. That case involved a parent's decision to allow the grandparents limited visitation. *Troxel*, 530 U.S. at 60-61. The safety, welfare, growth, or development of children were not at issue. But in a nonparental custody proceeding, the child's safety, welfare, growth or development is always at issue; otherwise, there is no basis for awarding custody to a nonparent. The court considers the presumption that fit parents act in their children's best interests when *initially deciding* whether to award custody to someone other than the parents. This presumption requires the court to deny nonparental custody unless the court finds that the parents are unfit or that placing the child with the parents will harm her. Once a nonparent petitioner establishes either of these factors, the court need not defer to the parents' decision making at every turn. Thus, the trial court did not err in declining to defer to the Budacks in all areas of decision making that concerned RRB.

## F. State Constitutional Claim

The Budacks argue that the court violated their right to privacy under our state constitution by granting Rosenthal custody of RRB. They offer a *Gunwall*[8] analysis and con-

---

[8] In *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986), the Washington Supreme Court set forth a list of six nonexclusive criteria for determining when the Washington Constitution extends broader rights to citizens than the United States Constitution. The factors are (1) the textual language of the Washington constitutional provision; (2) differences in the texts of the state and federal

clude that article I, section 7 of the Washington Constitution[9] gives citizens greater privacy rights than does the United States Constitution. We disagree.

First, article I, section 7 primarily governs search and seizure. The Washington State Constitutional Convention adopted this provision in 1889. *State v. Ringer*, 100 Wn.2d 686, 690, 674 P.2d 1240 (1983) (citing THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION, 1889, at 497 (Beverly Paulik Rosenow ed., 1962)). The convention first considered a provision "identical to the fourth amendment to the United States Constitution and rejected it in favor of the present Const. art. I, § 7." *Ringer*, 100 Wn.2d at 690. Most of the cases interpreting article I, section 7 have been search-and-seizure cases.

Nonetheless, a few cases have considered whether article I, section 7 confers a right to privacy outside the search and seizure context. For example, in *Bedford v. Sugarman*, 112 Wn.2d 500, 772 P.2d 486 (1989), the issue was whether the State could constitutionally require addicts to move into shelters to receive benefits. *Bedford*, 112 Wn.2d at 501. Our Supreme Court noted that although it had examined article I, section 7 in the context of search and seizure cases, "[w]e have not . . . previously undertaken a careful consideration of the extent to which this provision guarantees a more general right of privacy." *Bedford*, 112 Wn.2d at 506. The court declined to do so in that case, absent "particularized briefing" on the question. *Bedford*, 112 Wn.2d at 506. But in a footnote, the court noted that the "few decisions applying article I, section 7 outside the search and seizure context have attributed to the provision no broader scope than federal constitutional privacy law." *Bedford*, 112 Wn.2d at 506 n.5.

The Court of Appeals reached the same conclusion in

---

constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) structural differences between the state and federal constitutions; and (6) matters of particular state or local concern. *Gunwall*, 106 Wn.2d at 58.

[9] Washington Constitution, article I, section 7 states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

*State v. Ramm*, 66 Wn. App. 15, 830 P.2d 395 (1992). Ramm challenged an ordinance limiting the number of small animals allowed in single-family homes. *Ramm*, 66 Wn. App. at 17. She argued that the state constitution affords citizens greater privacy rights than does the United States Constitution. Division One rejected her argument, holding that except for search and seizure cases, the state constitution affords no greater privacy right than does the federal constitution. But the *Ramm* court compared article I, section 7 with the federal Fourth Amendment. In contrast, the Budacks urge this court to compare article I, section 7 with the privacy protection of the federal Due Process Clause.

Such a comparison is problematic for several reasons. First, a *Gunwall* analysis compares a state constitutional provision with its federal counterpart. *State v. Lee*, 135 Wn.2d 369, 387, 957 P.2d 741 (1998). The primary federal counterpart for article I, section 7 is the Fourth Amendment, not the Fourteenth. And even if we conduct a *Gunwall* analysis of nonparallel state and federal provisions— the state privacy clause and the federal Due Process Clause[10]—there is another problem: The United States Constitution does not expressly guarantee the right to privacy. Rather, the United States Supreme Court has recognized such a right arising from the First, Fourth, Fifth, Ninth, and Fourteenth amendments. *Roe v. Wade*, 410 U.S. 113, 152, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). Thus, analyzing the second *Gunwall* factor (comparison of textual differences) is impossible because there is no explicit federal privacy provision to compare.

But even if a *Gunwall* analysis is appropriate, it does not support the Budacks' claim that the state constitution affords greater privacy protection than the federal constitution in custody matters. The first *Gunwall* factor, the text

---

[10] Article I, section 3 of the Washington Constitution contains the state Due Process Clause. It offers no greater protection than the federal Due Process Clauses of the Fifth and Fourteenth Amendments. *State v. Manussier*, 129 Wn.2d 652, 679, 921 P.2d 473 (1996).

of article I, section 7, weighs in favor of a superior state right to privacy. The text identifies two objects of protection: a person's "home" and "private affairs." *State v. Young*, 123 Wn.2d 173, 179, 867 P.2d 593 (1994). Custody of their daughter certainly affects the Budacks' private affairs. The Budacks argue that the second factor, textual differences, supports their claim because the state guarantee of privacy is more explicit than the federal guarantee. This argument might be persuasive if not for the third factor, the constitutional history of article I, section 7. The Washington Constitutional Convention adopted section 7 instead of one modeled on the federal Fourth Amendment. This suggests that the framers of the Washington Constitution were contemplating privacy issues related to search and seizure, *not* general privacy concerns, when they adopted this provision. Thus, even though the language of article I, section 7 grants a specific privacy right, the Budacks' interpretation fails when we consider the circumstances surrounding the adoption of the provision.

The Budacks cite *Lovell v. House of the Good Shepherd*, 9 Wash. 419, 37 P. 660 (1894) for the fourth factor, preexisting state law. In *Lovell*, the Washington Supreme Court awarded custody of a minor child to her parents despite evidence that the child's mother was "coarse, vulgar and pugnacious." *Lovell*, 9 Wash. at 423. The Budacks argue that *Lovell* demonstrates preexisting Washington law recognizing the right of fit parents to the custody and care of their children. This is true, but the case does not hold that Washington law protects parent-child relationships more than federal law does. The *Lovell* court recognized that despite parents' right to the custody of their children, there are situations when it is appropriate for the state to intervene to protect children. *Lovell*, 9 Wash. at 423. It did not assert that parents' privacy interest in their children is absolute or precludes any state action that interferes with that interest. In fact, Washington courts have long recognized that there is a tension between parents' rights and children's welfare, and that the state's interest in protect-

ing children's welfare may outweigh parental rights. *Allen*, 28 Wn. App. at 646 (citing cases involving struggle between parents' rights and children's welfare).

The structural comparison, factor five, will always support an independent state constitution analysis because "the federal constitution is a grant of power from the states, while the state constitution represents a limitation of the State's power." *Young*, 123 Wn.2d at 180. The final factor, whether the issue is one of state or local concern, weighs in the Budacks' favor. Issues of custody and family relations are matters of state or local concern. *Rose v. Rose*, 481 U.S. 619, 625, 107 S. Ct. 2029, 95 L. Ed. 2d 599 (1987) (domestic relations law traditionally left to state regulation).

Overall, the *Gunwall* factors suggest that article I, section 7 does not provide greater protection for privacy interests than does the United States Constitution. The privacy provision of the Washington Constitution is largely concerned with protecting citizens from unreasonable search and seizure. And no case has suggested that section 7 was intended to afford greater privacy protection outside the search and seizure context than the federal constitution. Although Washington courts recognize parents' rights to the custody and care of their children, the cases cite to United States Supreme Court cases to support this proposition. *See, e.g.*, *Smith*, 137 Wn.2d at 13-15. We conclude that for purposes of this case, the privacy rights conferred by our state constitution are equal in scope to federal privacy rights.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, J., concurs in the result.

MORGAN, J. (dissenting) — In *Troxel v. Granville*,[11] the United States Supreme Court ruled that the "best interests of the child" test set forth in RCW 26.10.160(3) was unconstitutional as applied. In *In re Custody of Smith*,[12] the Washington Supreme Court held that the "best interests of the child" test set forth in RCW 26.10.160(3) and RCW 26.09.240 was facially unconstitutional. The statute at issue here, RCW 26.10.100, contains the very same test. As a result, it is unconstitutional to the same extent that RCW 26.10.160 and 26.09.240 were unconstitutional in *Troxel* and *Smith*, and we should reverse in the same way those cases reversed.

I do not join in the majority's discussion of the state constitution, because we should not be reaching that issue.

If the statute were constitutional, I would not quarrel with the rest of the majority's rulings.

Reconsideration denied October 24, 2001.

Review granted at 145 Wn.2d 1033 (2002).

---

[11] 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

[12] 137 Wn.2d 1, 969 P.2d 21 (1998), *aff'd*, 530 U.S. 57 (2000).