84 P.3d 905 (2004)
120 Wash.App. 108
In re the CUSTODY OF Christian William SHIELDS, Jenny Shields, Respondent, and
Susan Harwood, Appellant.
No. 21741-8-III.
Court of Appeals of Washington, Division 3, Panel Eight.
February 12, 2004.
*906 Gary R. Stenzel, Gary R. Stenzel PS, Spokane, WA, for Appellant.
Lee R. McGuire, Attorney at Law, Davenport, WA, for Respondent.
KURTZ, J.
Chris Shields is the only child of Michael Shields and Susan Harwood who divorced when Chris was three years old. Under the parenting plan, Chris was placed with his father by agreement of the parties and his mother was granted liberal visitation rights. When Chris was five years old, his mother moved to Oregon and his father remarried. Mr. Shields later adopted his wife's daughter, and the couple had a child of their own. When Chris was 11 years old, Mr. Shields died as the result of an accident. Upon learning of Mr. Shields's death, Ms. Harwood informed the Shields family that she would be taking Chris back to Oregon; Ms. Harwood, accompanied by a sheriff's deputy, took Chris from the Shields home the day after his father's funeral. Four days later, Ms. Shields filed this nonparent custody action. After a trial, the court granted custody of Chris to Ms. Shields and reinstated Ms. Harwood's visitation rights under the parenting plan.
Under RCW 26.10.030, a nonparent may commence an action seeking custody of a child "but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." The issue before us is the appropriate standard to be applied in custody litigation involving a parent and a nonparent. We hold the appropriate standard is parental unfitness or detriment to the child as stated in In re Marriage of Allen, 28 Wash.App. 637, 646-47, 626 P.2d 16 (1981). We further hold RCW 26.10.030 does not impose a standing requirement that mandates the court to enter a finding of parental unfitness before the case can proceed. Affirming the judgment of the trial court, we hold the trial court did not err by awarding custody of Chris to his stepmother.

FACTS
Chris Shields is the only child of Michael Shields and Susan Harwood. Chris's parents were married in 1989. Chris was born on November 14, 1990; his parents divorced in September 1994, when Chris was three years old. Under the parenting plan, Chris was placed with his father as the primary residential *907 parent by agreement of the parties. His mother was granted liberal visitation.
In May 1995, Michael Shields and Jenny Wisecarver began dating. They were married in July 1996, when Chris was five years old. Ms. Shields had a daughter, Lea, who was eight years old at the time of the marriage. The next year, Mr. Shields adopted Lea. Two years later, Michael and Jenny had a son, Michael.
In 1996, Susan moved to Willamina, Oregon. She married Curt Harwood in January 1997. A new parenting plan was entered a few months later. Under the second plan, Susan's visitation was reduced from two full weeks each month to one weekend each month and changes were made in the Christmas schedule and the summer schedule. The court also entered an order of child support. The net support obligation of $112.20 was reduced to $25 per month in light of Susan's financial situation. From 1994 until this order was entered in May 1997, Susan did not make child support payments or contribute to Chris's expenses. Moreover, at the hearing she expressed dissatisfaction with the court's decision to set the amount at $25 per month.
Mr. Shields died as the result of an accident in August 2001, when Chris was 11 years old. At the time of his father's death, Chris had lived in the same house since 1991. This house was on a farm outside Lamont, Washington. The trial court later found that Chris "had extremely close ties with his extended family, neighbors and friends in the Lamont area his entire life." Clerk's Papers (CP) at 236.
Ms. Harwood had not been involved with Chris's daily rearing. Her visitation became sporadic soon after the couple divorced and telephone contact was irregular with long periods of time between contacts. At trial, Ms. Harwood estimated that she took advantage of 15 percent of the weekend visitations, but, with one exception, 100 percent of the major visitation weeks available during summer, spring break, and Christmas. However, during this time she had never asked for, or seen, Chris's report cards; she had attended one of Chris's teacher conferences, one of his ball games, and one of his concerts.
When Ms. Harwood learned of Mr. Shields's death, she immediately contacted the Shields family, asked them to pack Chris's belongings, and notified them that she intended to pick up Chris immediately and take him to Oregon. Ms. Harwood was eventually persuaded to wait a few days until after the memorial service so that Chris would be able to attend the service. One day after the memorial service, Ms. Harwood arrived to take Chris to Oregon. A deputy sheriff was present at Ms. Harwood's request, further traumatizing Chris. Chris did not want to go with Ms. Harwood, but was persuaded that he should go.
Five days after the funeral, four days after Chris left for Oregon, Ms. Shields filed this action, petitioning for nonparent custody of Chris. Contrary to the assertions of Ms. Harwood, Ms. Shields did not wait until spring 2001 to file her petition. The court appointed Dennis Cronin as Guardian Ad Litem (GAL) and later entered an order clarifying the duties of the GAL.[1]
Prior to Mr. Shields's funeral, Ms. Shields took Chris to a grief counseling session with Dr. Frank Hamilton in Spokane. Dr. Hamilton also saw Chris in February and March 2002. Dr. Hamilton concluded that Chris was emotionally close to his stepmother and that there was a strong bond between them. Dr. Hamilton also noted that Chris considers his home to be in Lamont, Washington, and that his family consists of his stepmother and his two siblings. Dr. Hamilton concluded that these bonds were stronger than Chris's bonds to his mother.
Approximately six weeks after his moving to Oregon, Chris met with a social worker, Jeri Merkle. Ms. Merkle spent 31 hours with Chris over a 14-month period. Sixteen of those hours were sessions with Chris or various combinations of Chris, his mother, and his stepfather. The remaining sessions *908 were with another person through the Mother Oaks treatment program.
Ms. Harwood took Chris to Oregon in August 2001. Chris had no personal contact with his stepmother or his siblings from September 2001 until April 2002. During December, Ms. Harwood restricted Chris's telephone contact with his family in Lamont.
Trial in this matter was held in November 2002 at which time the court was presented with the testimony of Ms. Shields, Ms. Harwood, Mr. Harwood, Mr. Cronin, and Ms. Merkle. The court also interviewed Chris in chambers.
In his testimony, Mr. Cronin stated Chris was strongly bonded to Ms. Shields as his primary psychological parent and, by contrast, he perceived Ms. Harwood as "uncaring for his needs, unfair, hostile to his family in Washington, cruel, and punitive." CP at 207. Mr. Cronin also reported that Chris considered his true home to be Lamont, Washington, and his family unit as comprising of his stepmother, his half brother, and his half sister. Mr. Cronin noted that while Chris did not dislike Ms. Harwood, he was very frustrated by her perceived failure to appreciate his needs and desires. Mr. Cronin concluded that Chris strongly desired to reside in Washington with his stepmother and siblings.
Furthermore, Mr. Cronin expressed surprise that, when he met with Chris in January 2002, Chris had not had any physical contact with Ms. Shields and his siblings since August 2001. Chris told Mr. Cronin that Ms. Harwood had taken away all telephone contact with his relatives in Washington for the month of December. Mr. Cronin concluded that Ms. Harwood had arbitrarily restricted contact between Chris and his stepmother and siblings. In his report, Mr. Cronin also noted that Dr. Hamilton expressed concern that Chris, as he entered adolescence, would be more likely to act out in anger and frustration in the home in Oregon as opposed to the home in Washington. At trial, Mr. Cronin testified that both he and Dr. Hamilton felt that actual detriment would occur if Chris was required to live away from his psychological parent, Ms. Shields, and his siblings. Mr. Cronin recommended that Chris be allowed to reside with his stepmother and siblings in Washington with reasonable visitation with his mother and stepfather in Oregon.
Ms. Merkle testified that she met with Chris from September 2001 until June 2002. She further stated that the sessions were cancelled after Chris returned from his visitation to Washington because "things were going along well." Report of Proceedings (RP) at 146. Ms. Merkle had another session with Chris shortly before the trial because he had a "slump" that she attributed to the court case. RP at 154.
Ms. Merkle testified that when she first met Chris, he held his mother in disdain. Ms. Merkle stated that while Chris was adamant then that he did not want to be with his mother, this feeling had diminished over time. She believed Chris was now beginning to view Oregon as his home and, if asked for a decision about where he wanted to live, he would now respond that he did not know. According to Ms. Merkle, Chris had made progress during the year he had resided in Oregon. She saw evidence that he had progressed to the point where he was able to formulate a life of his own.
Although Ms. Merkle met with Chris for 16 sessions, Chris never mentioned his siblings to her. Ms. Merkle attributed this omission to the fact that issues concerning his family constellation were overwhelming to him. Ms. Merkle noted that Chris had an emotional attachment with his stepmother and that he talked about her in a way of "close emotional attachment." RP at 126. Ms. Merkle encouraged Ms. Harwood to keep the channels of communication open between Chris and his Washington family. However, Ms. Merkle acknowledged that physical visitation did not happen for some time and that Ms. Harwood made "not the best choice" by grounding Chris from the use of the phone. RP at 143.
Ms. Merkle testified as to her impression that Chris was "incredibly bonded and attached to his father" and that he perceived his father as a "hero." RP at 92, 110. She explained that Chris would have a "tremendous confrontation of disillusionment" when *909 he was finally confronted with the circumstances of his father's death. RP at 111. According to Ms. Merkle, this confrontation would probably occur in mid-adolescence and would affect his development. Ms. Merkle believes that this process is going to be "horrendous" for Chris depending on his age and the stage of his developmental process when this confrontation occurred. RP at 112.
According to Ms. Merkle, there might be "issues" if Chris lived with his stepmother in Washington. RP at 137. Specifically, Ms. Merkle expressed concerns about parental alienation, emotional enmeshment, bereavement issues, and problems Chris might have being a middle child with a sibling who is the namesake child. Although Ms. Merkle testified at length about parental alienation, she conceded in cross-examination that she could not say that parental alienation existed here.
Ms. Harwood testified that she always intended for Chris to attend his father's funeral. Ms. Harwood also testified that she never grounded Chris from contacting his stepmother but that she did ground him from using the phone. She found it "obnoxious" that when Chris was first with her, he raced her to the phone and would try to pull it away from her. RP at 218. As she explained:
It's pretty pathetic, when every time the phone rang, after he was first there, that he would race you to it, because he always knew it would be for him, whether it was for somebody else. He would ignore the beep, because we have call waiting. If I had a phone call come in, he would say, "Well, I'll have you call her back," while hewhile he used the phone.
RP at 218. When Ms. Harwood reported this behavior to Ms. Merkle, Ms. Merkle suggested that Ms. Harwood should not keep Chris from contacting his relatives in Washington. Ms. Harwood testified that she had not thought about this when she grounded Chris from use of the phone. During this time, Ms. Harwood did permit Chris to use e-mail.
Ms. Harwood felt that Chris had done well during the period he spent at her house even though he had experienced "ups and downs." RP at 215. Ms. Harwood found Chris to be "kind of clingy" when he first arrived at her house and that he was "still clingy." RP at 227. However, she pointed out that Chris had been elected class president, that he was doing fairly well in school, and that he was in a program for the talented and gifted. Ms. Harwood believed that Chris's difficult times coincided with telephone calls from Washington relatives.
The trial court interviewed Chris in chambers.[2] Chris told the court that while things were "okay"[3] and going better in Oregon, he wanted to go "home" to Lamont, where his brother and sister lived. ICRP at 9. The court questioned Chris to determine whether Chris wanted to go to Lamont because he thought he needed to help his stepmother. Chris responded that he wanted to go back "because that's where it feels like home." ICRP at 13.
Chris told the court that his stepmother was "like my mom," and that he got along better with his stepmother than his mother because they had been together longer. ICRP at 13. Chris acknowledged that he called both his mother and his stepmother "Mom." ICRP at 15. When asked what he would do if he went back to Lamont, Chris stated: "I would probably go to school at Lamont, and I would help my mom, and I wouldI would really help out on the farm, andI would be really happy." ICRP at 15. Chris told the court that if he went back to Lamont he would like to have visitation with his mother "[j]ust as it was before." ICRP at 24. The court emphasized the impact of this interview, noting the boy's demeanor and body language.
On December 28, 2002, the court entered a lengthy memorandum opinion, followed later by a nonparent custody decree. The court granted custody of Chris to Ms. Shields and ordered that visitation should continue in accordance with the prior parenting plan.
*910 The court concluded that Ms. Shields was still Chris's primary psychological parent and that, despite living with his mother for over a year, Chris was not strongly bonded to his mother, but remained strongly bonded to his stepmother and his siblingsand that it was "highly doubtful this situation will change." CP at 242.
The court expressed grave concern over Ms. Harwood's conduct following Mr. Shields's death and her arbitrary restriction of Chris's contact with his family in Lamont, despite contrary advice from Chris's counselors. The court repeated Ms. Merkle's concern that Chris would eventually have problems dealing with his father's death. The court noted that Chris had reported to the GAL that Ms. Harwood and her mother speak ill of his deceased father and his stepmother and that, on at least one occasion, Chris hid in a closet to avoid hearing the criticism. The court stated: "Based upon [Ms. Harwood's] conduct and that of her mother as reported by Chris to the guardian ad litem, the Court is much more concerned that this information will be presented to Chris in an inappropriate way thus causing more harm to him." CP at 238.
In a similar vein, the court questioned Ms. Harwood's conduct following Mr. Shields's death, particularly her arbitrary restriction of Chris's contact with Ms. Shields and his siblings, despite contrary advice from Chris's counselors. The court noted that the GAL's conclusion that the manner in which Chris was removed from the house after his father's death was "psychologically and emotionally abusive"[4] and that the separation of Chris from his siblings and stepmother over the following Thanksgiving and Christmas "`was a most difficult continuation of the abuse.'" CP at 241. And, the court noted the GAL's conclusion regarding Ms. Harwood's "`complete failure at such a critical time to put her needs second to those of her son.'" CP at 241. Overall, the trial court found that Ms. Harwood treated Chris "more as an object to be possessed than a person who has desires and needs which must be dealt with." CP at 241. While the court concluded that Ms. Harwood was "not unfit in the usual sense," the court noted that Ms. Harwood had "certain unfit characteristics which in the GAL's estimation makes her unfit for placement consideration." CP at 247.
The court concluded that the psychological relationship between Chris, his stepmother, and his siblings was the factual equivalent of a natural family entity. The court noted that both Dr. Hamilton and the GAL concluded that breaking up this family by allowing Chris to remain in Oregon "is presently causing and will continue to cause actual detriment to Chris which will adversely affect his growth and development." CP at 241. The court also concluded that "[t]he overwhelming weight of evidence suggests that Chris' mental health and his future development in adolescence is at risk if he remains in Oregon." CP at 246-47. The court also concluded that Chris had rights of association and that he was of sufficient age and maturity to express a preference as to his placement.
Ms. Harwood appeals, contending that the court erred by (1) permitting the case to proceed absent a finding that she was unfit, (2) applying a best interests standard or a detriment to the child standard, (3) awarding custody based on Chris's wishes and/or an assessment of the "totality of the circumstances," (4) granting custody based on a New York case recognizing a constitutional right of a child to association with a person with whom the child had developed a parent-like relationship, and (5) finding sufficient evidence to support a showing of detriment to Chris if he remained with his mother and was separated from his psychological parent and his de facto family in Washington. The commissioner granted accelerated review.

ANALYSIS
Standard of Review. A trial court's custody disposition will not be disturbed on appeal absent a manifest abuse of discretion. Schuster v. Schuster, 90 Wash.2d 626, 632, 585 P.2d 130 (1978). "A trial court abuses its discretion when its decision is manifestly unreasonable or based on *911 untenable grounds." In re Marriage of Kovacs, 121 Wash.2d 795, 801, 854 P.2d 629 (1993). This court reviews a trial court's findings of fact to determine whether they are supported by substantial evidence. In re Marriage of McDole, 122 Wash.2d 604, 610, 859 P.2d 1239 (1993).
What standard applies in a nonparent custody action under chapter 26.10 RCW when the court is asked to determine custody as between a parent and a nonparent?
A parent's right to rear his or her children without state interference has been viewed as a fundamental liberty interest protected by the Fourteenth Amendment and a fundamental right derived from privacy rights inherent in the constitution. In re Custody of Smith, 137 Wash.2d 1, 15, 969 P.2d 21 (1998), aff'd sub nom., Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Accordingly, state interference with this fundamental right is not permitted unless the state demonstrates both a compelling interest and narrowly tailors the interference to meet only that interest. Id.
This is a nonparent custody proceeding under chapter 26.10 RCW. Prior to 1987, parent and nonparent custody actions were governed by chapter 26.09 RCW, which required courts to determine custody based on the best interests of the child. Former RCW 26.09.190 (1973). However, courts determining nonparent custody cases were reluctant to apply the best interests standard when determining custody as between a parent and a nonparent. See In re Marriage of Allen, 28 Wash.App. 637, 626 P.2d 16 (1981).
The Allen court concluded that courts determining custody between a parent and nonparent must apply a more stringent balancing test to protect both the parents' constitutional rights to privacy and the family entity. Id. at 645-46. Allen held that the state may interfere with the parents' constitutional rights only if (1) the parent was unfit, or (2) "the child's growth and development would be detrimentally affected by placement with an otherwise fit parent." Id. at 647, 626 P.2d 16. Significantly, the Allen court proposed the detriment to the child standard as a "middle ground" requiring a showing more than best interests, but less than parental unfitness. Id. at 649, 626 P.2d 16. The Allen court concluded that a finding of unfitness was not required in a nonparent custody proceeding because the neglect and termination provisions served a different purpose and resulted in the drastic consequence of depriving the parent of all rights to the child. Id.
In 1987, the Washington legislature adopted chapter 26.10 RCW, which deals exclusively with nonparent custody actions. Under RCW 26.10.100, the courts are required to "determine custody in accordance with the best interests of the child." However, the legislature's purpose in adopting chapter 26.10 RCW was "to reenact and continue the law relating to third-party actions involving custody of minor children." RCW 26.10.010. As a result, the court in In re Custody of Stell, 56 Wash.App. 356, 365, 783 P.2d 615 (1989) held that the legislature, in adopting chapter 26.10 RCW, intended to incorporate Allen's judicial interpretation of the earlier statute. Like Allen, Stell determined that in a custody proceeding between a parent and a nonparent, the nonparent must show that the parents are unfit or that placement with an otherwise fit parent would detrimentally affect the child's growth and development. Stell, 56 Wash.App. at 365, 783 P.2d 615.
In a recent nonparent custody case, In re Custody of R.R.B., 108 Wash.App. 602, 31 P.3d 1212 (2001), Division Two considered the constitutionality of the best interests standard set forth in RCW 26.10.100. In R.R.B., the trial court granted a nonparent custody concluding that while the parents were fit, placing R.R.B. in their custody would detrimentally affect her growth and development. Id. at 606, 31 P.3d 1212. In upholding the court's decision, the R.R.B. court was guided by the Supreme Court's reasoning in Smith and Troxel.
In Smith, the court decided Washington's nonparent visitation statutes were unconstitutional because the statutes impermissibly interfered with a parent's fundamental rights by authorizing the court to grant third *912 party visitation after a determination that such visitation was in the best interests of the child. The nonparent visitation statutes were unconstitutional, the court reasoned, because the statutes lacked a threshold requirement of a finding of harm to the child if the third party visitation was not permitted. Smith, 137 Wash.2d at 20-21, 969 P.2d 21. The United States Supreme Court affirmed, with a plurality of the court concluding, that the Washington nonparent visitation statute was unconstitutional as applied because the trial court failed to presume that the mother was a fit parent and that she acted in her children's best interests. Troxel, 530 U.S. at 68, 120 S.Ct. 2054.
In examining the constitutionality of the nonparent custody statute, the R.R.B. court examined Smith, Troxel, Allen, and Stell. The court noted that Washington courts have consistently applied Allen's two-part test in nonparent custody cases. Hence, the court in R.R.B. concluded that RCW 26.10.100 was constitutional as construed because the two-part Allen standard recognizes the presumption that a fit parent will act in the best interests of his or her child. R.R.B., 108 Wash.App. at 614-15, 31 P.3d 1212. Significantly, the court in R.R.B. concluded that this statute is not facially unconstitutional because the statute "recognizes the presumption of parental fitness, and the remedy is narrowly tailored to further the state's interest," which the court identified as "protecting children's welfare." Id. at 615, 31 P.3d 1212. Finally, the court also determined that the statute was not unconstitutional as applied because the evidence supported the trial court's determination that R.R.B.'s growth and development would be detrimentally affected by placement with her parents. Id. at 615, 31 P.3d 1212.
In summary, we reaffirm our agreement with Allen which concluded that "where placing the child with an otherwise fit parent would be detrimental to the child, the parent's right to custody is outweighed by the State's interest in the child's welfare." Allen, 28 Wash.App. at 649, 626 P.2d 16. Allen considered the detriment standard to be a "middle ground" requiring a showing more than best interests, but less than parental unfitness. Id. Nevertheless, the requisite showing under Allen is substantial. While the detriment standard does not require a showing of parental unfitness, it does require a showing of actual detriment to the child's growth and development.
The detriment standard evolved in the nonparent custody context because this standard accomplishes the balancing that must occur in this setting. "[I]n a nonparental custody proceeding, the child's safety, welfare, growth or development is always at issue; otherwise, there is no basis for awarding custody to a nonparent." R.R.B., 108 Wash.App. at 616, 31 P.3d 1212. In nonparent custody cases, a standard must be applied that balances the interests of the state in protecting the child with the important privacy interests of the parents. We agree with R.R.B. that in custody proceedings between a parent and a nonparent RCW 26.10.100 and Allen recognize the presumption of parental fitness, while providing a remedy narrowly tailored to further the state's interest in protecting children's welfare. See R.R.B., 108 Wash.App. at 615, 31 P.3d 1212.
Does the Nunn case impose a standing requirement that precluded the court from awarding custody to Ms. Harwood?
Under RCW 26.10.030,[5] a nonparent may commence an action seeking custody of a child "but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." (Emphasis added.) Relying on In re Custody of Nunn, 103 Wash.App. 871, 14 P.3d 175 (2000), Ms. Harwood contends that RCW 26.10.030 imposes a standing requirement that mandates dismissal of a nonparent custody petition in the absence of substantial evidence that the parent is unfit. In other words, Ms. Harwood contends that Nunn establishes that a nonparent lacks standing to petition for custody *913 against a fit parent who has physical custody of the child.
In Nunn, the child's aunt sought nonparent custody as against the child's mother. The parents had divorced and the parenting plan regarding their son Chance granted both parents legal custody, but the plan granted residential time disproportionately to the father and gave him the discretion to require the mother's time to be supervised due to her drinking problem. Several years after the parenting plan was entered, the mother completed a treatment plan and, at the time of trial, had remained sober for five years. From 1988 until 1991, the father's sister occasionally cared for Chance and this aunt moved into the father's house one month before he died of leukemia. Nunn, 103 Wash.App. at 874-75, 14 P.3d 175.
Two days before the father died, the aunt filed a nonparent custody proceeding alleging that the mother was unfit because she was a severe alcoholic who continued to abuse alcohol and who also worked as a prostitute. The court granted temporary custody to the aunt while the GAL completed his report. The GAL's report concluded that the aunt was the more stable of the caretakers, but that the mother and son had a bonded relationship and that the son consistently expressed his desire to live with his mother. The GAL also reported that the mother's psychotherapist stated that the mother worked hard to address her problems and that she was competent to care for Chance. Likewise, the son's psychotherapist reported that there was a strong bond between mother and son and, at this point in the son's development, that bond likely outweighed any of the mother's probable deficits as a parent. Id. at 876, 14 P.3d 175. The GAL recommended that the mother be granted temporary custody of Chance pending the entry of a permanent parenting plan. Id.
Based on the GAL's recommendation, the court returned Chance to his mother until the trial. At trial, the court found that the mother was an unsuitable custodian because she was unfit. Significantly, the aunt admitted at trial that when she filed the nonparent custody petition alleging that the mother was unfit, the aunt had no idea that the mother had successfully completed a treatment plan and had been sober for five years. Id. at 879-80, 14 P.3d 175.
The Nunn court reversed the custody order and returned Chance to his mother's custody without restrictions. Id. at 888, 14 P.3d 175. In making this decision, the court framed the issue as one of standing. The court stated that "a threshold inquiry for any nonparental child custody action under Ch. 26.10 RCW is whether the nonparent petitioner has standing to bring the action, that is, whether the nonparent petitioner can produce substantial evidence to support the allegation of parental unfitness by which he or she gained entry to the courthouse in order to file the petition." Id. at 883, 14 P.3d 175. The court concluded: "Without substantial evidence of parental unfitness, a nonparent petitioner lacks standing to bring the action, and it should be dismissed." Id.
We believe the holding in Nunn is limited. The case arose from unfounded allegations of parental unfitness that commenced a process that intruded on the integrity of the family unit. In the words of the court, "There can be no other conclusion from the evidence in this record but that Lauren Arneson lost custody of her child because she tried to defend the integrity of her family unit against State intervention that was unfounded in the first place because it was based on a petition containing allegations of parental unfitness that ultimately proved to be false." Nunn, 103 Wash.App. at 888, 14 P.3d 175. As a result, the Nunn court described its standing requirement in terms of unfitness, not detriment. Significantly, the Nunn court relied on In re Marriage of Allen, 28 Wash. App. 637, 626 P.2d 16 (1981), but did not address the detriment standard.
We further note that a reading of the statute does not support the standing requirement purportedly enunciated in Nunn. Under RCW 26.10.030, a nonparent may commence an action seeking custody of a child "but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." (Emphasis added.) The statute requires that the petitioner allege that the parent is not a "suitable custodian," *914 a term that encompasses an inquiry into either unfitness or detriment. Simply put, the language in the statute does not require proof of unfitness or imply that allegations based on the detriment standard are insufficient to establish standing.
In conclusion, we hold a nonparent can establish standing against a parent who has physical custody of the child without demonstrating that the parent is unfit. Here, the trial court's finding that Ms. Harwood was "not unfit in the usual sense"[6] did not deprive Ms. Shields of standing to bring this nonparent custody action.
Did the court here err by awarding custody of Chris to his stepmother?
The trial court made several findings to support its decision to award custody to Chris's stepmother. The court concluded that while Ms. Harwood was "not unfit in the usual sense," and noted that the GAL asserted that "she has certain unfit characteristics which in the GAL's estimation makes her unfit for placement consideration." CP at 247. The court also discussed the concept of de facto family and concluded that here, as in Allen, the child was so well integrated into the nonparent's family as to constitute an established fact. The court also concluded that Ms. Shields "was and still is Chris' psychological parent" and that "the psychological relationship between [Ms. Shields], her family, and Chris, is equivalent to that of a natural family entity." CP at 247.
Of greatest significance, the court made determinations as to detriment to Chris. The court concluded that: "The overwhelming weight of evidence suggests that Chris' mental health and his future development in adolescence is at risk if he remains in Oregon. On the contrary, the evidence suggests that his mental health will prosper if he is returned to Lamont." CP at 246-47. The court concluded that it would be detrimental to Chris's well-being to be separated from his siblings and that the reasons for separating Chris from his siblings did not "appear to be compelling in light of the totality of the circumstances." CP at 248. The court concluded that "there has been a showing of actual detriment to Chris should he be allowed to continue to reside in Oregon in a situation which is, in effect, against his will." CP at 248. And that "[t]he totality of the circumstances dictate that Chris should be returned to his de facto family." CP at 248.
Ms. Harwood first contends that the court incorrectly applied the best interests standard when making its decision to grant custody to a nonparent. Ms. Harwood is mistaken. Although the court briefly addressed the best interests standard, the court applied the Allen standard.
Ms. Harwood next argues that Allen is distinguishable based upon the following factual differences. First, Allen involved a custody dispute between the stepmother and the father that took place during a dissolution proceeding. Second, the child was living with the stepmother when she commenced the action. Third, the child was disabled. Finally, the stepmother had provided a therapeutic environment for him. Despite these factual distinctions, we are persuaded by the Allen court's decision.
In Allen, the stepmother petitioned for custody of Joshua, her husband's child from an earlier marriage. Joshua was with the stepmother when she filed the petition and remained with her during the pendency of the action, including the appeal. Allen, 28 Wash.App. at 640, 626 P.2d 16. Joshua was deaf and, at age three, his intellectual functioning was already lagging, when the stepmother entered his life. Over the next four years, the stepmother helped Joshua learn sign language, took special classes herself, had her own three children learn sign language, and worked diligently to see that Joshua received special training. At the time of trial, Joshua was functioning at a level of intellectual development equivalent to that of hearing children his age. Id. at 641, 626 P.2d 16.
The Allen court established that parental rights may be outweighed where the parent is found to be unfit or where "circumstances are such that the child's growth and development would be detrimentally affected by *915 placement with an otherwise fit parent." Id. at 647, 626 P.2d 16. The Allen court then affirmed the award of custody to the nonparent on two grounds. First, the court concluded that there was evidence to support the trial court's conclusion that Joshua's future would be detrimentally affected by placement with his father whose sign language capability was inadequate. Id. Second, the court determined that Joshua had become integrated into the nonparent's family and that the de facto family relationship did not include the father. Id. at 648, 626 P.2d 16. The court also found that there was a psychological relationship between the stepmother, her family, and Joshua that was the equivalent of a natural family. Id.
Ms. Harwood's attempts to limit the court's holding miss the mark. First, the fact that the nonparent custody action in Allen was litigated as part of a divorce proceeding has no affect on the standard applied by the court. Second, the fact that Joshua was living in the stepmother's home during the pendency of the action was not mentioned or considered by the court. Third, the fact that Joshua was deaf clearly affected the court's determination that placement with the father would be detrimental, but was not specifically mentioned in the court's discussion of the existence of a "de facto" family and the psychological relationship that had formed between the stepmother, her family, and Joshua. In other words, nothing in the Allen court's decision attempts to limit the application of these concepts to nonparent custody actions involving the disabled. In fact, to the contrary, the court concluded that custody may lie with a nonparent where a child is integrated into the nonparent's family and the de facto family relationship does not include the biological parent. Id. at 648, 626 P.2d 16.
In addition to her arguments related directly to the application of the Allen decision, Ms. Harwood also contends that the trial court failed to apply the proper standard because the court based its decision primarily on Chris's wishes, an assessment of the "totality of the circumstances," and the application of a New York caseWebster v. Ryan, 189 Misc.2d 86, 729 N.Y.S.2d 315 (2001). We shall address these arguments in turn, but this discussion will take us back to Allen.
To support her argument that the trial court based its decision primarily on Chris's wishes, Ms. Harwood points to the court's statement that "the Court has determined that there has been a showing of actual detriment to Chris should he be allowed to continue to reside in Oregon in a situation which is, in effect, against his will." CP at 248.
Did the court base its decision primarily on Chris's wishes? No, this statement has been taken out of context. In conducting its inquiry into the question of detriment, the court had to examine the extent of Chris's psychological bond to his mother and his stepmother, and Chris's feelings about his two families and the two home environments. In making its decision, the trial court carefully examined the evidence and applied the Allen standard; the court's decision was not based solely on a determination of which house 12-year-old Chris liked better.
Ms. Harwood also contends that the court applied a "totality of the circumstances" standard that, like the "best interests" standard, is improper in a nonparent custody action. This argument is without merit. Certainly, when the court stated that the "totality of the circumstances dictate that Chris should be returned to his de facto family,"[7] the court was not applying a new standard, but, rather was summarizing the reasons for the court's decision under the Allen standard. The need for a careful case-by-case examination of all of the relevant facts was recognized in In re Marriage of Allen, 28 Wash.App. 637, 626 P.2d 16 (1981). When discussing the showing required to meet the detriment standard, the Allen court explained: "Precisely what might outweigh parental rights must be determined on a case-by-case basis. But unfitness of the parent need not be shown." Allen, 28 Wash.App. at 649, 626 P.2d 16.
Additionally, Ms. Harwood contends that the trial court based its decision on Webster and the mistaken belief that Webster stood for the proposition that a child has a constitutional *916 right to have input in his or her custody determination. Ms. Harwood also points out that Webster is a visitation case, not a custody case.
In Webster, a foster mother sought the continuation of contact with her foster child after the biological father had obtained custody. Webster, 189 Misc.2d at 89-90, 729 N.Y.S.2d 315. The Webster court, a family court in Albany County, New York, found that the child had been denied equal protection of the laws under the Fourteenth Amendment and the New York Constitution because the State of New York had failed to provide a statutory basis for a child to assert his right to associate with a person with whom the child has developed a parent-like relationship. Id. at 87-88, 729 N.Y.S.2d 315. Ms. Harwood is mistaken in her assertion that the trial court based its decision solely on Webster. While the trial court acknowledged Chris's right of association and that he was of sufficient age and maturity to discuss a preference as to his custody placement, the trial court did not base its decision solely on Webster or a child's constitutional right to remain in contact with a psychological parent. Here, the trial court applied the Allen standard and based its decision on the determination that harm would result to Chris unless he was placed in the home of his psychological parent with his de facto family.
Lastly, Ms. Harwood suggests that the court abused its discretion because the court's award of custody is based on speculation. Throughout the record here, the adults associated with Chris expressed great concern over the difficulties he would encounter in adolescence as he dealt with circumstances surrounding his father's death. Ms. Merkle, Chris's grief counselor, believed that this process was going to be "horrendous"[8] for Chris depending on his age and the stage of development when this process occurred. Based on the record here, the court did not abuse its discretion by awarding custody of Chris to his stepmother.
In sum, we affirm the decision of the trial court because the court properly applied the Allen standard. The court's finding of detriment to Chris if he was placed with his mother is supported by evidence of actual detriment including the showing that Ms. Shields was Chris's psychological parent and that Chris was integrated into her family.
I CONCUR: BROWN, C.J.
SWEENEY, J. (dissenting).

ISSUE AND STANDARD OF REVIEW
If the question presented here were whether the trial judge abused his discretion in weighing the best interests of this child, I would defer to his decision. But that is not the question before the court. The threshold issue is whether the nonparent had standing to start custody proceedings and, even more fundamentally, whether the superior court had authority to enter any order absent a threshold finding that this custodial parent was unfit. RCW 26.10.030. "Courts do not have the right or power to take the custody of children from their parents, unless the parents show that they are unfit to have such custody and the children are treated with cruelty or exposed to immoral or debasing conditions." In re Welfare of Hudson, 13 Wash.2d 673, 693, 126 P.2d 765 (1942).
Put another way, what was the source of the government's power to interpose itself between this mother and her child? Upon what authority did the superior court appoint a guardian ad litem, receive evidence, enter findings, and issue orders contrary to the wishes of Chris Shields's mother, Susan Harwood?
The jurisdiction of the trial court to enter a valid order is a question of law that we review de novo. In re Marriage of Susan C., 114 Wash.App. 766, 773, 60 P.3d 644 (2002).

FACTS
Chris Shields's parents divorced when he was three years old. When he was five, Michael Shields married Jenny and adopted Jenny's daughter. The couple had another child during the marriage. Chris lived with his father, stepmother, and siblings on a farm near Lamont, Washington. His mother, now Susan Harwood, also remarried and *917 made her home in Oregon. When Chris was 11, Michael Shields died. Following his death, Ms. Harwood resumed custody of her son and brought him to live with her in Oregon.
Ms. Shields filed a petition under chapter 26.10 RCW for nonparent custody of Chris. The petition contains a conclusory statement that the mother is not a suitable custodian. Clerk's Papers (CP) at 9. Instead of facts supporting the mother's unsuitabilityi.e., unfitnessas a custodian, the petition alleges simply that Ms. Shields would be a more appropriate custodian, based on the fact that the child resided with his father and stepmother for over half of his life, and that the child's best interests would be served by his remaining with Ms. Shields. Id.
The court nevertheless appointed a guardian ad litem (GAL) to investigate Ms. Harwood's parental fitness. The GAL reported, but not on Ms. Harwood's fitness. Instead, the GAL focused on Chris's self-reported closer bonding with Ms. Shields and his expressed preference to live with his stepmother. Id. at 207-08. The report concludes with the gratuitous legal opinion that a parent's fundamental right to the custody of her children must be balanced against the child's right to freedom of association. Id. at 208-09.
In his one-on-one interview with the judge, Chris said things were okay at his mother's, that he had made friends and adjusted, and that he liked his mother's home. In Camera Report of Proceedings (Nov. 21, 2002) at 5. His mom and step dad were "nice" and he got along well with both of them. Id. at 14. He was in touch with Ms. Shields by e-mail and phone calls "[o]nce or twice a week" and that he could call her when he wanted to. Id. at 7. He spent five weeks in the summer with the Shieldses. Id. Chris could not give the court a specific reason for his preference to live with Ms. Shields, just that it felt like home. Id. at 9, 13.
In its memorandum opinion, the court acknowledged the fundamental rights of parents to raise their children without the interference of the state. CP at 243. But the court reasoned that these interests must yield to the state's inherent parens patriae interest and a child's fundamental liberty interest in freedom of association. Id. at 244-45. The court concluded that Ms. Shields had standing to bring a custody action as a person in loco parentis to Chris. Id. at 245. The court was persuaded that to thwart Chris's desire to live in the home of his choosing would cause unspecified actual detriment. Id. at 246-47.
The court entered a final order awarding custody to Ms. Shields.

GUIDING CONSTITUTIONAL PROVISIONS
Parents have a fundamental right to the care and custody of their children. In re Custody of Smith, 137 Wash.2d 1, 15, 969 P.2d 21 (1998), aff'd sub nom., Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); In re Neff, 20 Wash. 652, 655, 56 P. 383(1899) When a nonparent challenges a parent's constitutional right to custody, we must begin with the presumption that the parent is fit and acting in her child's best interests. Troxel, 530 U.S. at 68, 120 S.Ct. 2054. The nonparent must rebut that presumption. It is not the mother's burden to disprove a judicial presumption that the child's best interests lie elsewhere. Id. at 69, 120 S.Ct. 2054. A simple disagreement between the court and a parent over a child's best interests is not sufficient to override the parent's fundamental rights. Id. at 72-73, 120 S.Ct. 2054; In re Custody of R.R.B., 108 Wash.App. 602, 612-13, 31 P.3d 1212 (2001). Both the government (in the person of the court) and Ms. Harwood want the best interests of Chris. The question is who has the right to decide what is in his best interests. And, absent some showing of unfitness, the United States Supreme Court has clearly answered that question in Troxel. The mother decides.

WASHINGTON AUTHORITY
The cases relied on by the majority are distinguishable. The legislature has empowered the superior court to make child custody decisions in the context of dissolution proceedings. RCW 26.09.050. The court in In re Marriage of Allen, for example, retained residual authority under the prior dissolution *918 as well as ultimately finding the parent unfit. In re Marriage of Allen, 28 Wash.App. 637, 643-44, 626 P.2d 16 (1981). In Schuster v. Schuster, also a dissolution case, error was assigned to the findings on a petition by a natural parent to modify the parenting plan. Schuster v. Schuster, 90 Wash.2d 626, 628, 585 P.2d 130 (1978). In re Marriage of Kovacs also involved a custody dispute between natural parents in the context of dissolution proceedings. In re Marriage of Kovacs, 121 Wash.2d 795, 797, 854 P.2d 629 (1993). In re Marriage of McDole reviews the trial court's exercise of discretion in a postdissolution modification petition also governed by chapter 26.09 RCW. In re Marriage of McDole, 122 Wash.2d 604, 609, 859 P.2d 1239 (1993).
But the dissolution provisions of chapter 26.09 RCW do not govern nonparent custody petitions. Neither does the in loco parentis doctrine invoked by the trial court.
The common law in loco parentis doctrine charges stepparents with a duty to support the child. One is in loco parentis who puts herself "in the situation of a lawful parent by assuming the obligations incident to the parental relation." State v. Waleczek, 90 Wash.2d 746, 752-53, 585 P.2d 797 (1978). The doctrine does not endow a stepparent with custody rights equal or superior to those of a natural parent. See, e.g., Harmon v. Dep't of Soc. & Health Servs., 134 Wash.2d 523, 535-36, 951 P.2d 770 (1998); In re Marriage of Farrell, 67 Wash.App. 361, 365-66, 835 P.2d 267 (1992). Moreover, the stepparent's legal relationship with the child ends with the marriage. State v. Gillaspie, 8 Wash.App. 560, 562-63, 507 P.2d 1223 (1973).
And so superior court jurisdiction over this child must be found elsewhere.
Superior court jurisdiction to remove a child from the custody of a natural parent and to award custody to a nonparent is found solely in chapter 26.10 RCW. I find no constitutional provision, statute, or judicial decision under which the superior court may acquire subject matter jurisdiction to transfer custody of a child from his parent to a nonparent outside the authority of chapter 26.10 RCW.
The subject of our review is the trial court's construction of RCW 26.10.030. Specifically, did Ms. Shields meet the threshold set forth in RCW 26.10.030 for standing to invest the court with the power to substitute its judgment for that of Ms. Harwood as to how best to care for her child? And, again, we review statutory interpretation de novo. In re Marriage of Wilson, 117 Wash.App. 40, 45, 68 P.3d 1121 (2003). Our goal is to carry out the intent of the legislature. In re Dependency of R.V., 113 Wash.App. 716, 720, 54 P.3d 716 (2002).
When the language of a statute is plain, it is not subject to interpretation; we simply read it. Wilson, 117 Wash.App. at 45, 68 P.3d 1121; R.V., 113 Wash.App. at 720, 54 P.3d 716. And, by its plain language, RCW 26.10.030 raises parental unfitness to the level of standing. A nonparent may petition only if the child is either not in the custody of either parent, or if neither parent is a suitable custodian. RCW 26.10.030(1). Only then may the court substitute its judgment for that of the parent as to what is in the best interests of the child or what may be detrimental to the child. RCW 26.10.100; Mecum v. Pomiak, 119 Wash.App. 415, 81 P.3d 154, 156-57(2003). (citing In re Custody of Nunn, 103 Wash.App. 871, 883-84, 14 P.3d 175 (2000)).
Here, Chris was in the custody of his mother. And, as the trial court found, the mother was not unfit. Upon what authority, then, did the state divest Ms. Harwood of custody?
The court may not consider a nonparent petition without a preliminary determination that a well-founded allegation of unfitness has been pleaded. Nunn, 103 Wash.App. at 883, 14 P.3d 175. Statutory standing is a prerequisite for superior court subject matter jurisdiction over the custody of children. Allen, 28 Wash.App. at 642-43, 626 P.2d 16. Only after acquiring jurisdiction over the child does the court have the power to enter custody orders in the child's best interests. In re Welfare of Hudson, 13 Wash.2d 673, 681-82, 126 P.2d 765 (1942) Otherwise, the petition must be dismissed. Nunn, 103 Wash.App. at 883, 14 P.3d 175.
The nonparent custody cases marshaled in support of the holding here are also distinguishable *919 because standing and jurisdiction were not at issue in those cases. In Allen, the court had residual jurisdiction under prior dissolution proceedings, and the judge ultimately found the parents unfit. Allen, 28 Wash.App. at 643, 626 P.2d 16. In In re Custody of Stell, the child was not living with either parent. In re Custody of Stell, 56 Wash.App. 356, 361, 783 P.2d 615 (1989) In R.R.B., the biological father had surrendered his parental rights when the parents adopted the child. R.R.B., 108 Wash.App. at 604, 31 P.3d 1212. In recognizing the biological father's right to petition under chapter 26.10 RCW, R.R.B. does not abrogate the statutory standing requirements. Like any other nonparent, the father had standing to seek custody under chapter 26.10 RCW "`only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian.'" R.R.B., 108 Wash.App. at 606-07, 31 P.3d 1212 (quoting RCW 26.10.030(1)).

CONCLUSION
A nonparent lacks standing to petition for custody of a child from a fit parent with physical custody. The jurisdiction restrictions of chapter 26.10 RCW mirror the profound constitutional deference accorded to parental rights. The standing requirements simply reflect the presumption of fitness of a natural parent who presently enjoys custody. R.R.B., 108 Wash.App. at 612, 31 P.3d 1212.
Where the parent has already lost or relinquished custody, fitness is not presumed and unfitness need not be alleged to establish standing. RCW 26.10.030. If the parent has custody, the petition must allege that the parent is not a suitable custodiani.e., is unfit. RCW 26.10.030(1).
Here, the petition did not allege and the superior court did not find that the custodial parent was unfit. Therefore, the court lacked subject matter jurisdiction to substitute its judgment for that of the mother as to Chris's best interests.
I would reverse and dismiss the petition.
NOTES
[1] Ms. Harwood's counsel objected both to the duties assigned to the GAL and to the manner in which he performed those duties. But Ms. Harwood has not assigned error to these orders and the issue of the GAL's credibility is a matter for the trial court, not this court.
[2] The Report of Proceedings for the November 21, 2002 in chambers interview with Chris Shields shall be referred to as "ICRP."
[3] ICRP at 14.
[4] CP at 242.
[5] In 2003, the legislature amended chapter 26.10 RCW by adding section 6, which now requires an "adequate cause" hearing to be decided on affidavits and provides for the denial of the motion for a custody order unless adequate cause is established. See Laws of 2003, ch. 105, § 6.
[6] CP at 247.
[7] CP at 248.
[8] RP at 112.